**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| SOURUSHE ZANDVAKILI, | : | Case No. 1:20-cv-902 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, et al., | : | |
| | : | |
| Defendants. | : | |

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

This case is before the Court on Defendant University of Cincinnati's motion for summary judgment (Doc. 23). The plaintiff, Iranian-born Professor Sourushe Zandvakili, sought promotions and pay raises. He did not obtain the promotions and only received one small raise. He brings claims for national origin discrimination and retaliation, as well as a claim under 42 U.S.C. § 1983. For the reasons explained below, the Court **GRANTS** the motion for summary judgment.

## FACTS

Plaintiff Sourushe Zandvakili is a professor at the University of Cincinnati ("UC"). (Doc. 38-1, Pg. ID 1243, ¶ 6.) He was born in Iran and has lived in the United States since high school. (*Id.* at Pg. ID 1242, ¶ 1.) UC first hired him in September 1987. (*Id.* at ¶ 2.) Since then, he has never held an associate dean or dean position, but in 2008, he was appointed head of the Department of Economics in the College of Arts & Sciences. (*Id.* at ¶¶ 4-5.)

1

Beginning in April 2018, leadership positions began opening up at UC. The parties discuss four roles that Professor Zandvakili either applied for directly or showed interest in.

1. The first of these roles was the Director of the Masters of Arts in Human Resources ("MA-HR") program. (Doc. 38-1, Pg. ID 1245, ¶ 18.) Professor Zandvakili emailed Defendant Nick Williams about this role on April 28, 2018. (*Id.*) He did not formally apply for the MA-HR Director role, but did express interest in it before it became available. (*Id.* at ¶ 25.) Elaine Hollensbe, the Management Department Head, was responsible for selecting the director of the MA-HR program. (*Id.* at ¶ 22.) Ultimately, an annual adjunct, Mike Wagner, got the job. (Hollensbe Dep., Doc. 22, Pg. ID 805; Doc. 38-1, ¶ 27.)

2. Also in April 2018, Dean David Szymanski stepped down as Dean of the Lindner College of Business. (Doc. 38-1, Pg. ID 1248. ¶ 30.) This opened up a position for Interim Dean. Professor Zandvakili nominated himself for the job. (*Id.* at ¶¶ 33-34.) Nick Williams, an Associate Dean at the time, was also nominated. (*Id.* at ¶ 32.) The Provost, Kristi Nelson, ended up appointing Williams. (*Id.* at ¶¶ 35, 37.)

3. Then there was the position as Dean of the Lindner College of Business. UC conducted a search for the next Dean. (Doc. 38-1, Pg. ID 1249, ¶ 39.) Provost Nelson, with the help of a search committee, appointed Defendant Marianne Lewis as Dean. (Nelson Dec., Doc. 23-2, Pg. ID 874, ¶ 4.) She had been serving as the Dean for a business school in London for the previous four years, and before that had served as the Associate Dean at UC's College of Business for about nine years. (Doc. 38-1, Pg. ID 1249, ¶ 41.)

2

4. Last there was a position as the Associate Dean of the Impact and Partnerships program, which needed filling during the summer of 2019. (*Id.* at Pg. ID 1250, ¶ 46.) Professor Zandvakili applied for this position on December 6, 2019. (Ex. 45, Doc. 15-1, Pg. ID 502.) He interviewed for this position with Dean Marianne Lewis and the search committee. (Doc. 38-1, Pg. ID 1249, ¶ 47.) Chuck Sox got the job. (Zandvakili Dep., Doc. 15, Pg. ID 273.)

In addition to seeking promotions, Professor Zandvakili also sought pay raises in 2018 and 2019, under Article 15 of the Collective Bargaining Agreement between UC and the American Association of University Professors. (Ex. 68, Doc. 16-1, Pg. ID 567.) The first request was denied. For the second, he received a smaller raise than he requested.

## LAW AND ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). We look at the facts, and draw inferences from those facts, in a light most favorable to the non-moving party. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court is under no obligation to plumb the record for genuine issues of material

3

fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). The possibility of a factual dispute does not preclude summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Similarly, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy,* 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

UC challenges each of Plaintiff's claims.

## I.    Title VII National Origin Discrimination

Plaintiff claims he was discriminated against because his nation of origin is Iran. He sought several promotions to leadership positions, but other individuals, who were not from Iran, received the promotions instead of him. He also sought pay raises pursuant to Article 15 of the Collective Bargaining Agreement, but either did not receive a raise or did not receive as high of an increase as he asked for. This too he claims was because he is from Iran.

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may make a discrimination claim either by

4

direct evidence or circumstantial evidence that supports an inference of discrimination. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). This is not a direct evidence case.

To establish a discrimination claim indirectly by circumstantial evidence, the plaintiff carries the burden of establishing a prima facie case. To do so in the failure-to-promote context requires a showing that (1) he is a member of a protected class; (2) he applied and was qualified for the promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time the plaintiff's request was denied. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). Succeeding this, the burden shifts to the defendant to provide some legitimate, nondiscriminatory reason for not hiring the plaintiff for the position. *Ivasic v. Northcoast Behav. Healthcare Sys.*, No. 5:06 CV 1062, 2007 WL 9753115, at *5 (N.D. Ohio Nov. 14, 2007). Once that happens, the burden shifts back to the plaintiff to show that the reason was pretextual and that the real reason was discriminatory. *Id.* The plaintiff usually does this in one of three ways: by showing that (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the employer's conduct; or (3) the proffered reason was insufficient to warrant the challenged conduct. *Lu v. Univ. of Dayton*, --- F. Supp. 3d ---, No. 3:22-CV-92, 2023 WL 253243, at *5 (S.D. Ohio Jan. 18, 2023).

The Court will consider the promotions first and then the raise requests.

**A. Director of the MA-HR Program**

Plaintiff fails to lay out a prima facie case of discrimination regarding the position

5

as Director of the MA-HR program. He admits that he did not actually apply for the MA-HR director role. (Doc. 38-1, Pg. ID 1247, ¶ 25.) There are limited circumstances in which a plaintiff may maintain a Title VII failure-to-hire claim without having formally applied for the position. *Allen v. Deerfield Mfg. Inc.*, 424 F. Supp.2d 987, 994 (S.D. Ohio 2006) (citing *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir. 1989)). *See also Johnson v. Cargill, Inc.*, 932 F. Supp.2d 872, 888 (W.D. Tenn. 2013). One circumstance is when a formal application would have been futile because the discrimination is so entrenched and pervasive. *Allen*, 424 F.2d at 994. Another is when the employer has a practice of hiring without asking for applications or posting the opening. If that is the case, then the plaintiff must show that he had more than just a general interest in the position. *Wanger*, 872 F.2d at 146.

Plaintiff has not pointed to evidence showing that either exception applies here. The closest exception would be the second one, given Plaintiff's interest in the position. But he does not show that UC has a *practice* of hiring without asking for applications. Indeed, his claims concerning the other positions, which involved interviews and search committees, demonstrate that UC's standard practice generally entails calling for applications before appointing someone to a leadership role.

Independent to his failure to establish a prima facie case, Plaintiff does not appear to pursue any claim concerning the MA-HR director role in his memorandum in opposition. So his discrimination claim regarding that position is abandoned. *Brown v. VHS of Michigan, Inc.*, 545 F. Appx. 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when

a plaintiff fails to address it in response to a motion for summary judgment."); *Halker v. Bob Evans Farms, Inc.*, No. 2:13-CV-893, 2014 WL 4472651, at *3 (S.D. Ohio Sept. 11, 2014).

Accordingly, UC is entitled to summary judgment on Plaintiff's Title VII discrimination claim regarding the role as Director of the MA-HR program.

**B. Interim Dean**

UC gives legitimate reasons for hiring someone else instead of Plaintiff to fill the role as Interim Dean. So the Court will proceed to pretext without deciding whether Plaintiff has established a prima facie case. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244 (6th Cir. 2023).

Kristi Nelson selected Nick Williams for the Interim Dean position. (Doc. 38-1, Pg. ID 1248, ¶¶ 30-35.) Williams, UC contends, was selected because of his experience. Plaintiff disagrees, maintaining that he had similar qualifications and was even superior to Williams in some regards. He points to his long list of academic accomplishments, including citations. (Ex. 28, Zandvakili Dep., Doc. 15-1, Pg. ID 488-89.) As such, in his view, the evidence suggests that UC's reasons for selecting Williams instead of him are pretextual.

The legitimate reason UC points to is Williams' experience. He became the Associate Dean for Graduate Programs in February 2016. (Williams Dep., Doc. 17, Pg. ID 604.) Because of his experience and the recommendations from others he had received, Nelson believed he was the best individual for the Interim Dean role. (Nelson Dec., Doc. 23-2, Pg. ID 873-74, ¶ 3.)

Plaintiff therefore must show pretext. Employees often show pretext by showing

that the employer's proffered reason (1) had no basis in fact, (2) was insufficient motivation for the employment action, or (3) did not actually motivate the adverse employment action. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021). Plaintiff's qualifications argument seems to fall under the third category.

The record bears no signs that UC's reason for hiring Williams as the Interim Dean masked an animus for Plaintiff because of his Iranian origin. Williams was already serving as an Associate Dean at the college, where he had demonstrated leadership skills. (Williams Dep., Doc. 17, Pg. ID 604; Nelson Dec., Doc. 23-2, Pg. ID 873, ¶ 3.) As such, Williams was suited for the role already. Making that fact even more clear is the additional fact that other people apparently thought so too, given the recommendations Williams received. (Nelson Dec., Doc. 23-2, Pg. ID 873, ¶ 3.) Plaintiff does not offer evidence that he received any recommendations, besides his own. It may be true that he had more citations than Williams. But he does not show that citations were a factor for selecting an interim dean. Although his curriculum vitae shows that he was the head of the Economics Department from 2008 to 2012, and a director of the Applied Economics Research Institute from 2007 to 2008, he had never held a position as a dean. And those leadership roles had been many years prior. Williams, in contrast, was a current associate dean, with leadership skills others were willing to vouch for. (*Id.*) For these reasons, nothing Plaintiff has pointed to suggests that UC's reason for appointing someone else as the Interim Dean was a pretextual coverup for discrimination.

On this record, then, UC is entitled to summary judgment on Plaintiff's Title VII claim for national origin discrimination as it relates to the Interim Dean position.

### C. Dean of the Lindner College of Business

As with the role as Director of the MA-HR program above, Plaintiff's opposition brief does not address his discrimination claim as it relates to his attempt to become Dean of the Lindner College of Business. Accordingly, his Title VII claim as it relates to that role is abandoned and UC is entitled to summary judgment on that aspect of Count I. *Brown*, 545 F. Appx. 368, 372; *Halker*, 2014 WL 4472651, at *3.

### D. Associate Dean of the Impact and Partnerships Program

The Court will again assume, without deciding, that Plaintiff has made a prima facie case of national origin discrimination. *Goldblum*, 2023 WL 2446138, at *3. In this case, UC contends that it hired Chuck Sox instead of Plaintiff based on Sox's past experience and interview. Plaintiff argues that UC's reasons for selecting Sox have shifted over time. This, plus his record, in his view, establish pretext.

Plaintiff seems to make the argument that UC's proffered reason did not actually motivate its decision to hire Sox instead of him. After review of the record, the Court is unpersuaded. The record shows that after Marianne Lewis took over as Dean in 2019, she set out to fill three Associate Dean positions. One of them was as the Associate Dean of Impact and Partnerships. Plaintiff applied and was interviewed by Lewis and the search committee. (Doc. 38-1, Pg. ID 1250, ¶¶ 46-47.) He was a finalist. (Lewis Dep., Doc. 16, Pg. ID 556.) The search committee, however, ended up agreeing to hire Chuck Sox. (*Id.*)

There is adequate support for the committee's decision to hire Sox. Craig Froehle, part of the associate dean search, described Sox as a "very competent person." (Froehle,

Doc. 21, Pg. ID 766, 772.) Sox had also had a relationship with a center in the business college that did "outreach for analytics-based consulting, research, and projects with local area businesses." (*Id.* at 771.) Elaine Hollensbe, another member of the committee, testified that Sox was a strong candidate because "he had had leadership experience" and recalled being "impressed with his qualifications." (Hollensbe Dep., Doc. 22, Pg. ID 807.) Lewis testified that the search committee followed a rubric and, based on their discussions, individually and collectively agreed "that Chuck Sox was more experienced and better positioned for the key phases of the impact and partnership role." (*Id.*)

None of this is inconsistent with what UC originally sought to fill in the Associate Dean role. The job posting advertised a desire to "nurture and leverage our collective expertise, creativity and energy." (Doc. 36-1, Pg. ID 1190.) An associate dean would "drive related strategic initiatives, requiring highly respected and capable leaders, dedicated to serving our Lindner Community and to our core values of academic and inclusive excellence." (*Id.*) The purpose of the role would be to "ensure accountability for growing impact, visibility and revenue of non-degree offerings . . . and building related strategy and infrastructure." (*Id.*) The record supports the committee members' testimony that Sox had those qualities. No reasonable juror would find that Sox's experience and qualities did not supply the actual motivation for hiring him instead of Plaintiff. *Goldblum*, 2023 WL 2446138, *6.

Consequently, UC is entitled to summary judgment on Plaintiff's Title VII claim for discrimination as it relates to the Associate Dean position.

### E. Article 15 Salary Requests

Plaintiff also makes a national origin discrimination claim as it relates to his requests for pay adjustments on May 31, 2018, and July 1, 2019. On May 31, 2018, Plaintiff made an Article 15 request to Interim Dean Williams for a salary increase. (Doc. 38-1, Pg. ID 1254, ¶ 61.) Later, on July 10, 2019, he sought another Article 15 request from Dean Marianne Lewis. (*Id.* at Pg. ID 1256, ¶ 68.)

Unlike some of the above claims, the Court will not proceed on the assumption that Plaintiff lays out prima facie cases of discrimination here, because he does not. Plaintiff must present evidence that he (1) is a member of a protected group; (2) was subjected to an adverse employment action; (3) was qualified for the position; and (4) was treated differently from similarly situated individuals who were not members of the protected class." *Thomas v. Compuware Corp.*, 105 F. Appx. 60, 64 (6th Cir. 2004). Plaintiff cannot set out a prima facie case for either of the salary increase requests he made.

Start with the 2018 Article 15 request which Plaintiff made to Nick Williams. Critically, Nick Williams did not grant *any* Article 15 request while he was Interim Dean. The only one he even acted on was Plaintiff's. (Williams Dep., Doc. 17, Pg. ID 614.) (He received another Article 15 request shortly before he left the job but left it for the incoming dean. (*Id.* at Pg. ID 615.)) He did not approve Plaintiff's Article 15 request. (*Id.* at Pg. ID 623.) Plaintiff does not point to any other individual who made and was approved for an Article 15 request, and, thus, has not shown that he was treated differently from similarly situated individuals who were not part of the protected class.

Now turn to the 2019 Article 15 request Plaintiff made to Marianne Lewis. He

11

requested a raise of $50,000.  (Doc. 38-1, Pg. ID 1256, ¶ 68.)  Lewis did not approve him for a raise of $50,000.  But she did increase his pay by $6,000.  (*Id.* at Pg. ID 1257, ¶ 72.) Because he received a raise, he cannot satisfy the second prong: an adverse employment action.  "An adverse employment action is a 'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'"  *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (quoting *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)).  A pay raise within an acceptable range, but less than what the employee subjectively believes he deserves, is not a "materially adverse employment action."  *Thomas v. Compuware Corp.*, 105 F. Appx. 60, 64 (6th Cir. 2004).  Plaintiff does not show that the $6,000 increase he received was outside an acceptable range.

Furthermore, the professor who did receive a pay raise, David Brasington, is not similarly situated because the dean who approved that raise was David Szymanski. (Zandvakili Dec., Doc. 36-1, Pg. ID 1177, ¶ 38.)  At the prima facie stage, the alleged comparator must have had the same supervisor.  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020).  That is not the case between Plaintiff, whose dean was Lewis, and Brasington, whose dean was Szymanksi.  And, even if Plaintiff does establish a prima facie case, there is an even closer correlation required between the employee and comparator at the pretext stage.  *Id.* at 894.  But Plaintiff cannot show that he was substantially similar to Brasington, who had a different supervisor, much less that he was substantially identical to Brasington.  *See id.* at 894-95.

For these reasons, UC is entitled to summary judgment on Plaintiff's Title VII claims pertaining to his Article 15 requests.

\*　　\*　　\*

Plaintiff has failed to put forth the evidence required to survive a motion for summary judgment on his Title VII claim for discrimination. Accordingly, the Court grants UC's motion for summary judgment as it relates to Count I.

## II.    Retaliation

Title VII also prohibits an employer from retaliating against employees for exercising their Title VII rights. 42 U.S.C. § 2000e-3(a). As with a Title VII discrimination claim, a Title VII retaliation claim requires either direct evidence or circumstantial evidence that supports an inference of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). The elements of a retaliation claim are similar to those for discrimination but slightly different: a plaintiff must demonstrate that (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.* The causation element looks to traditional principles of but-for causation—the plaintiff must supply proof that the unlawful retaliation would not have occurred without the alleged wrongful conduct by the employer. *Id.* If the plaintiff succeeds in establishing a prima facie case of retaliation, then the burden of production shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for its actions. If the employer does so, then the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason was not the true reason. The burden of persuasion remains with the plaintiff. *Id.*

13

The Court will again analyze one position or pay raise request at a time.

**A. Associate Dean – Impact and Partnerships Program**

UC argues that there is no causal connection between any of Plaintiff's protected activity and decisions made about filling the associate dean position. Specifically, UC asserts that Plaintiff did not apply for the role until a year after his EEOC charge and many months after any internal complaint. This amount of time, in UC's view, is too remote to establish a causal connection. Plaintiff argues that the temporal proximity is not too great. He also argues that his ongoing complaints of discrimination and retaliation to Dean Lewis support a finding of pretext. Specifically, Plaintiff calls attention to Lewis's "admission" that the Provost's Office told her to hold off processing his Article 15 request while his EEOC charge was pending—this, he asserts, "smacks loudly of retaliatory intent." (Doc. 38, Pg. ID 1233.)

The Court will again proceed to pretext, because UC provides a nondiscriminatory reason for hiring someone else instead of Plaintiff. (*See supra*, Section I.D.)

Plaintiff's argument about Lewis's communication with the Provost's Office about Plaintiff requires the following recitation of the evidentiary record. On July 1, 2019—Marianne Lewis's first day as Dean—Plaintiff submitted another Article 15 request for a raise of $50,000. (Doc. 38-1, Pg. ID 1256.) On July 26, 2019, Plaintiff requested a meeting with Marianne Lewis, wishing to "discuss discrimination and retaliation [he and other faculty] have experience[d] at Lindner College of Business." (Doc. 15-1, Pg. ID 446.) They met on August 6, 2019. (*See id.* at Pg. ID 445.) At the time, he had a pending EEOC

complaint, filed November 14, 2018. (Doc. 38-1, Pg. ID 1258, ¶ 76.) After the meeting, he expressed surprise at hearing Lewis tell him that the Provost Office had told him not to process his Article 15 request—he had considered his request for a salary adjustment to be independent from his EEOC complaint. He requested that his request be processed during that academic year of 2019-20. (Doc. 15-1, Pg. ID 445.) Lewis responded the same day, explaining: "As I stated that I would not be reviewing any Lindner Article 15s until late fall . . . Matt [Serra] might have misunderstood and just have been confirming my timing was ok for you and all. I will check so that we can smoothly move forward then as planned." (*Id.*) A few days later, she followed up and told Plaintiff that his EEOC complaint and his Article 15 request were "separate and distinct" and that she would "review all pending Lindner Article 15 requests at end of Fall semester (Nov/Dec)." (*Id.*) Plaintiff wrote back, stating that he considered the Provost Office's communication to Lewis to "not process [his] request, and any unreasonable delay in processing my Article 15 request, further evidence of discrimination and retaliation." (*Id.*)

The Court fails to see how any of this supplies an inference that UC's reason for not appointing Plaintiff as Associate Dean—Sox's superior experience and suitability for the specific role in question—is a pretext for retaliation. Lewis acted on the Article 15 request on March 2, 2020. (Lewis Dep., Doc. 16, Pg. ID 550; Ex. 83, Lewis Dep., Doc. 16-1, Pg. ID 578.) In a letter to the Vice Provost on that date, she recommended a salary adjustment for Plaintiff resulting in an increase to his annual salary of $6,000. (Ex. 83, Lewis Dep., Doc. 16-1, Pg. ID 578.) She even requested that the increase "be backdated to the initial submission of Professor Zandvakili's Article 15 request on July 1, 2019"—

15

exactly what Plaintiff requested in his correspondence with her. (Doc. 15-1, Pg. ID 445.)
At that time, his first EEOC complaint, charge number 473-2019-00220, was *still pending*.
It would remain pending until August 11, 2020. (Doc. 15-1, Pg. ID 506-08. *See also id.* at
Pg. ID 509, where in his second EEOC complaint, filed June 16, 2020, he indicates his first
EEOC complaint was still pending.) Any concern about the confusion with the Provost's
Office, therefore, is ameliorated, because Lewis did not delay the processing of his Article
15 request while his EEOC complaint was pending.

On this record, then, the Court finds no evidence or inference lending any support
to Plaintiff's belief that UC was retaliating against him when it hired someone else to be
the Associate Dean. Accordingly, UC is entitled to summary judgment on Count II as it
relates to that role.

### B. Remaining Positions

Plaintiff does not advance arguments opposing summary judgment on Count II as
to the other positions he sought. For the same reasons in Section I above, those claims
are abandoned. *Brown v. VHS of Michigan, Inc.*, 545 F. Appx. 368, 372 (6th Cir. 2013);
*Halker v. Bob Evans Farms, Inc.*, No. 2:13-CV-893, 2014 WL 4472651, at *3 (S.D. Ohio Sept.
11, 2014).

### C. Article 15 Requests

#### 1. 2018 Request

Plaintiff's theory on his retaliation claim, as it relates to his Article 15 requests for
salary increases, is that UC retaliated against him for complaining about what he
perceived to be discriminatory conduct at the college. It starts on May 31, 2018, when

Plaintiff made a request to Interim Dean Williams, under Article 15 of the governing CBA, for a pay adjustment. (Doc. 38, Pg. ID 1254, ¶ 61.) After that, on July 20, 2018, he emailed Williams about the position as MA-HR director, which had been filled by Mike Wagner without the position being advertised. (Ex. 41, Zandvakili Dep., Pg. ID 489-90.) He asked Williams several questions about the process of filling the directorship, including whether the position was advertised (he asked for a copy of the position advertisement), who the members of the search committee were, and why he, "one of the most senior faculty who teaches in the MA-HR program . . . was not provided an opportunity to apply." (*Id.* at Pg. ID 490.) Williams responded, saying that the university rules did not require a search committee for that particular position, that the appointment followed the usual process, and that those positions are not advertised. (*Id.* at Pg. ID 491.) Plaintiff wrote back, informing Williams that he disagreed with his explanation and that he believed he was "denied an equal opportunity to apply and be considered" for the directorship. (*Id.*)

By now Plaintiff had already emailed (on July 17, 2018) Matt Olovson, the Executive Director of the Office of Equal Opportunity and Access (Zandvakili Dec., Doc. 36-1, Pg. ID 1177, ¶ 37.) He followed up with Olovson on August 14 and again on August 21. (Ex. A, Neff Aff., Doc. 37-1, Pg. ID 1196-97.) [1] Olovson responded on August 22,

---

[1] This email, and the affidavit it is attached to, is the object of a motion for leave to file surreply. UC contends that the affidavit and its attached documents ought to be stricken. (Doc. 41, Pg. ID 1526, n. 6.) Plaintiff filed a motion for leave to file a surreply in order to respond. UC maintains that there is no good cause for a surreply. Upon consideration of the circumstances here, UC is wrong. UC made an evidentiary challenge to materials attached to the responsive memorandum. In this specific circumstance, this constitutes good cause for permitting a surreply to respond to the challenge. So the Court will consider the arguments the parties make with respect to the appropriateness of the challenged evidence. UC argues

telling Plaintiff that a colleague, Matt Serra, "was making arrangements to discuss [the] Article 15 request with Nick Williams." (*Id.*)

For Williams' part, early that academic year, on or around September 6, 2018, he drafted a letter supporting a $7,500 increase in Plaintiff's salary. It was never sent. (Williams Dep., Doc. 17, Pg. ID 628, 644.) The next month, on October 9, 2018, Plaintiff followed up with Olovson again. He shared his belief that Williams' "inaction is the continuation of retaliation against me." (Ex. 24, Zandvakili Dep., Doc. 15-1, Pg. ID 441.) Among the reasons for his belief he was being retaliated against was the recent conflict over how the college filled the MA-HR program directorship. He concluded by saying that "Dean Williams is not fair minded" and "will continue the retaliation." (*Id.*) Two days later, on October 11, 2018, Williams denied Plaintiff's Article 15 request. He stated: "I write to inform you that I am not in support of your request for an Article 15 adjustment of your salary." (Ex. 59, Williams Dep., Doc. 17-1, Pg. ID 645.)

With respect to his Article 15 requests, Plaintiff's retaliation claim does not face the same problem faced in the discrimination context (the absence of a similarly situated individual). That is because the prima facie elements in a retaliation case are slightly different. UC improperly collapses the analyses for discrimination and retaliation. But retaliation claims do not require a similarly situated individual who was treated differently; instead they require a causal connection between the protected activity and

_____

that the evidence is unacceptable under Federal Rule of Civil Procedure 56 for various reasons, including because it is unauthenticated and hearsay. The Court disagrees. UC objects to the evidence's current form, but does not object that it "cannot be presented in a form that would be admissible in evidence." *Mangum v. Repp*, 674 F. Appx. 531, 537 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c)(2)). So the Court will consider the evidence here.

the materially adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). And, here, Plaintiff's complaints about being denied an equal opportunity to apply to a position to Williams constitutes sufficient but-for cause for Williams' eventual denial of Plaintiff's Article 15 request.

As legitimate, nonretaliatory reasons for denying his 2018 Article 15 salary adjustment, UC points to budgetary issues and Plaintiff's lack of merit for an Article 15 raise. So we turn to pretext. The fundamental question in the pretext analysis is: Did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-CV-656, 2010 U.S. Dist. LEXIS 34406, at *7 (S.D. Ohio Apr. 7, 2010).

Plaintiff essentially argues that the budgetary concerns are not what actually motivated Williams to deny Plaintiff's Article 15 request. When challenging an employer's actual motivation, a plaintiff generally admits the factual basis underlying the adverse employment action, but attacks the employer's explanation by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). In other words, the employee argues that the sheer weight of the circumstantial evidence of retaliation makes it more likely than not that the employer's explanation is a pretext. *See id.*; *Perry v. Covenant Med. Ctr., Inc.*, No. 15-CV-11040, 2017 WL 588456, at *7 (E.D. Mich. Feb. 14, 2017). To demonstrate pretext in this manner, the employee may not simply rely

19

on prima facie evidence, but must produce additional evidence. *Perry*, 2017 WL 588456, at *7.

Here, Plaintiff fails to rebut UC's position that budgetary constraints formed the actual basis for denying Plaintiff's 2018 Article 15 request. Review of the record and deposition testimony supports UC's position that budgetary concerns led to the denial of Plaintiff's 2018 Article 15 salary adjustment. Williams testified that, when he became Interim Dean, he learned that the college had a $2.1 million shortfall. (Williams Dep., Doc. 17, Pg. ID 623.) He was concerned about the "budgetary crisis" and, for that reason, decided not to grant the Article 15 request. (*Id.* at Pg. ID 624.) Elaine Hollensbe confirmed that "[w]e knew there was a budget shortfall." (Hollensbe Dep., Doc. 22, Pg. ID 800.) And Plaintiff was not the only one who had to do without during this time. Craig Froehle discussed the budget shortfall with Williams "[m]any times." (Froehle Dep., Doc. 21, Pg. ID 768.) He "wanted to do many things as Department Head and [Williams] basically said, no, we have no money." (*Id.*) As such, the "sheer weight" of the circumstantial evidence fails to show that UC's proffered rationale is "more likely than not" a coverup for something unlawful. *Smith*, 220 F.3d at 759.

Accordingly, UC is entitled to summary judgment on Count II as it relates to Plaintiff's 2018 Article 15 request.

### 2. 2019 Request

Regarding his 2019 Article 15 request, Plaintiff cannot lay out a prima facie case of retaliation for the same reason that plagued his discrimination case—he did receive a raise, so he cannot show that he suffered a materially adverse employment action.

*Thomas v. Compuware Corp.*, 105 F. Appx. 60, 64 (6th Cir. 2004).  So UC is entitled to summary judgment as to the 2019 Article 15 aspect of his retaliation claim as well.

*       *       *

As Plaintiff fails to produce evidence sufficient to survive summary judgment on any claim for relief falling under Count II, the Court grants UC's motion as it relates to the retaliation claim.

### III.    42 U.S.C. § 1983 and Equal Protection

Plaintiff only pursues his § 1983 and Fourteenth Amendment claims against Defendant Dean Lewis.  (Doc. 38, Pg. ID 1240.)  UC makes qualified immunity and Eleventh Amendment arguments, but the Court will just address UC's argument on the merits, as it is dispositive. The elements for making an Equal Protection claim under § 1983 are the same as those for establishing a Title VII claim.  *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917–18 (6th Cir. 2014).  And Plaintiff failed to establish his Title VII claims.  Accordingly, UC is entitled to summary judgment on Count III as well.  *Sharma v. Ohio State Univ.*, 25 F. Appx. 243, 249 (6th Cir. 2001).

**CONCLUSION**

For the reasons above, the Court **GRANTS** UC's motion for summary judgment and **TERMINATES** this matter from its docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND
