# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  January 25, 2024

Mr. Michael Jason Hendershot
Mr. Samuel Clifford Peterson
Office of the Attorney General of Ohio
30 E. Broad Street
25th Floor
Columbus, OH 43215

Ms. Katherine Daughtrey Neff
Freking Myers & Reul
600 Vine Street
Ninth Floor
Cincinnati, OH 45202

Re:  Case No. 23-3396, *Sourushe Zandvakili v. UC, et al*
Originating Case No. : 1:20-cv-00902

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name:  24a0034n.06

No. 23-3396

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

SOURUSHE ZANDVAKILI,

    Plaintiff-Appellant,

v.

UNIVERSITY OF CINCINNATI; DAVID SZYMANSKI, NICOLAS WILLIAMS, and MARIANNE LEWIS, in their official and individual capacities,

    Defendants-Appellees.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

</td></tr>
</table>

**FILED**
Jan 25, 2024
KELLY L. STEPHENS, Clerk

Before:  BOGGS, SUHRHEINRICH, and READLER, Circuit Judges.

SUHRHEINRICH, Circuit Judge.  Plaintiff Sourushe Zandvakili, a native of Iran and a tenured professor at the University of Cincinnati's Lindner College of Business, sued the University of Cincinnati and three individuals (collectively, the University) alleging national-origin discrimination and retaliation.  The district court granted summary judgment to Defendants. Zandvakili appeals.  For the reasons below, we affirm.

## I. BACKGROUND

**A.    Facts**

Zandvakili has spent his career as an economics professor at the University's Lindner College of Business.  He was born in Iran and emigrated to the United States at fifteen.  He earned a Ph.D. in economics at Indiana University in 1987 and was hired as an assistant professor in the Department of Economics by the University.  In 1993, he became a naturalized U.S. citizen and

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

was granted tenure by the University in 1999.  His work focuses on inequality and unconscious bias.

Zandvakili's curriculum vitae demonstrates that he has been a major contributor to the University.  He served as the Department Head of Economics, Director of the Applied Economics Research Institute, and Director of Graduate Studies in economics.  He also served as an Alumni Liaison, arranged notable speaker events, and established numerous connections in the local business community.  He published widely and is known for an inequality measurement, the *Maasoumi-Shorrocks-Zandvakili Index* or MSZ.  He updates a textbook yearly that brings in revenue for the business college.

On March 16, 2012, Illinois State University offered Zandvakili a tenured Full Professor position with a base salary of $180,000.  As a member of a collective bargaining unit for university professors, Zandvakili asked the University to match the offer pursuant to Article 15, which entitles members to request an increase to their pay to match a "bona fide offer" from another university.  Zandvakili's salary at the time was $118,529.  In accordance with policy, Zandvakili submitted a request to Defendant David Szymanski, Dean of the College of Business.  Szymanski denied the request on the grounds that a mere offer was insufficient to obtain a raise unless the candidate also demonstrated excellence on a national level.

Szymanski left the University in April 2018.  Just before he departed, Szymanski approved an Article 15 raise for US-born David Brasington, who was a tenured professor in Zandvakili's department.  In support of the raise, Szymanski explained that "Brasington is an internationally recognized researcher, ranking in the top 12th percentile . . . . Without an adequate salary adjustment, we may lose him to another university."  Brasington's salary rose from $151,373 to $186,000.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

After Szymanski departed, Defendant Nicolas Williams became Interim Dean of the College of Business beginning in May 2018. During Williams's tenure, Zandvakili sought several leadership positions. Of relevance to this appeal is the position of Director of Master of Arts in Human Resources (MA-HR). Zandvakili emailed Williams to express his interest in the position. Although the position was not yet open, Williams responded the next day that the position had already been filled. Notably, the position was filled without a public announcement, which the University states is typical and Zandvakili says is not.

Zandvakili believed that he was denied the opportunity to apply for the MA-HR position because of his national origin and in retaliation for complaints he had made about alleged discrimination. On July 20, 2018, Zandvakili communicated directly with Williams about the perceived discrimination and retaliation. He filed a formal complaint with the University's Office of Equal Opportunity and Access (OEOA) on July 25, 2018.

Around the same time that he was seeking the MA-HR position, Zandvakili again sought a pay raise. He made a second Article 15 request seeking a $50,000 increase, but this time based on equity. His salary was then $132,551. Zandvakili's department head, Debashis Pal, supported the request because Zandvakili's salary was (1) "substantially less than that of the other two [tenured] professors in the department of economics"; (2) "approximately $58,000 less than the average salary of [tenured] professors at Ph.D. granting economics departments nationwide"; and (3) "about $30,000 less than a professor at nearby Miami University (Ohio)," which didn't have a Ph.D. program. Pal explained that Zandvakili's "lifetime research achievement [was] comparable to that of Professors Brasington's and Pal's."

On August 22, 2018, Zandvakili learned that the Vice Provost of Academic Affairs, Matt Serra, planned "to discuss [his] Article 15 request with [] Williams." On September 6, 2018,

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Williams drafted, but never sent, a letter supporting a $7,500 increase in Zandvakili's salary. In the draft letter, Williams stated that Zandvakili's pay was "less than the highest paid associate professor in the Economics Department," and to "ensure that our [tenured] professors earn more than our associate professors, I am supportive of a $7,500 increase in Professor Zandvakili's salary."

By October 9, 2018, Zandvakili still had not received an answer to his Article 15 request, and he reached out to OEOA, stating his belief that Williams's inaction was retaliatory. Two days later, on October 11, Williams denied Zandvakili's Article 15 request. He explained in a letter to Zandvakili: "I am not in support of your request for an Article 15 adjustment of your salary. I do not believe that your request fulfills *any* of the conditions under the contract for such an adjustment." (emphasis added). Zandvakili then filed formal complaints with both the Equal Employment Opportunity Commission (EEOC) and OEOA on November 14, 2018.

On July 1, 2019, the University hired Defendant Marianne Lewis as the permanent Dean of the College of Business. The same day, Zandvakili filed a third Article 15 request, again seeking a $50,000 raise. He later met with Lewis to discuss the discrimination and retaliation that he thought he and others in the business school were encountering. During this time, Zandvakili's EEOC complaint was still pending. According to Zandvakili, Lewis told him that she had been instructed by the Provost's Office not to process his salary request while the EEOC charge was pending. In an email after the meeting, Zandvakili told Lewis that he was "surprised to hear you have been told by the Provost Office not to process my request," because he thought that his "equity salary adjustment request [wa]s independent of [his] EEOC complaint." He asked that his request be processed during the 2019–20 academic year. Lewis responded that Zandvakili's

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

EEOC complaint and Article 15 request were "separate and distinct" and that she would review all pending Article 15 requests in November or December of 2019.

Lewis eventually granted Zandvakili's Article 15 request on March 2, 2020, but only in the amount of $6,000. This brought his salary to $145,268.40. In her approval letter to Vice Provost Serra, Lewis explained that her recommendation was based on an approach she developed by "gathering external benchmark data to gauge overall salary position by discipline, rank, and AACSB[1] qualification, and internal data to ensure appropriate [colleague] comparators." When comparing Zandvakili to other professors, she noted his Economics discipline, his [tenured] professor rank, and his AACSB qualification. Zandvakili's AACSB qualification was "PA" for Practice Academic because he was not actively publishing.

Lewis stated that she used AACSB data to compare appropriate University salaries with comparable business schools. She used the median salary at comparable schools as a "reference point for excellence in research, teaching, and service." Lewis "conduct[ed] an internal assessment" by which she compared Zandvakili to the other two tenured Economics professors, who were "SA (Scholarly Academic) qualified." She acknowledged that Zandvakili's salary fell "below these other salaries," but explained that his "salary positioning [wa]s appropriate, given that SA qualified faculty are actively publishing in the field, while PA qualified faculty do not have the same recent publication record." Because there was not a comparable tenured PA professor in the Economics Department, Lewis compared Zandvakili to "the highest-salaried PA associate professor in Economics." Despite similar "performance records and long-standing service," she thought that Zandvakili's salary should "be positioned 10% higher than that

---

[1] Association to Advance Collegiate Schools of Business.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

[associate professor]," due to his superior rank.  This is how she derived the $6,000 figure.  She recommended that the raise be backdated to July 1, 2019, the date of Zandvakili's request.

Finally, Zandvakili applied for a promotion under Dean Lewis.  He sought the new position of Associate Dean of the Impact and Partnerships (I&P) program, which was created as part of Dean Lewis's "strategic plan" that "focused on creating relationships within the community of UC around innovation, as well as reaching out externally."  On the unanimous recommendation of the hiring committee, Lewis did not hire Zandvakili but instead hired Charles Sox, Ph.D.  Sox had joined the University in 2017 as a professor of Operations and Business Analytics (OBAIS).  Before that, he was Department Chair of Information Systems, Statistics, and Management Science at the University of Alabama.

## B.    Procedural History

Zandvakili brought this Title VII lawsuit, alleging national-origin discrimination and retaliation when the University did not select him in 2019 for the promotion to Associate Dean of I&P and denied his 2018 and 2019 Article 15 requests for a pay raise.[2]  The district court granted summary judgment to Defendants on all claims.  The district court assumed that Zandvakili established a prima facie case of discrimination regarding the promotion but held that the University offered a legitimate reason for hiring Sox instead of Zandvakili; to wit, Sox's superior experience and interview performance.

The district court cut short Zandvakili's discrimination claims relating to his Article 15 raise requests at the prima facie stage.  The court held that Zandvakili could not show discrimination regarding his 2018 request, because Williams did not approve any other Article 15

---

[2] He also sued under 42 U.S.C. 1983 but those claims are not before us.  Zandvakili was also not offered several other leadership positions, but he does not challenge on appeal the summary judgment on his claims regarding those positions.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

requests, and therefore Zandvakili could not show that he was treated differently from similarly situated individuals outside of the protected class. The court further held that Zandvakili did not suffer an adverse action in 2019 because Lewis gave him a $6,000 raise.

Regarding Zandvakili's retaliation claims, the court ruled that Lewis's conduct in processing Zandvakili's Article 15 request did not create an inference of retaliation based on Zandvakili's complaints over being denied promotion. The district court held that although Zandvakili had made out a prima facie case of retaliation as to his 2018 Article 15 request, he failed to rebut the University's legitimate non-discriminatory reasons for its denial—budget concerns and lack of merit. Finally, the district court held that Zandvakili did not make out a prima facie case of retaliation on his 2019 Article 15 request because he got a raise and, therefore, couldn't show a materially adverse action.

## II. LEGAL STANDARDS

We review the district court's grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of Zandvakili, as the non-moving party. *Novus Group, LLC v. Prudential Fin., Inc.*, 74 F. 4th 424, 427 (6th Cir. 2023). Summary judgment is appropriate only where the moving party shows "that there is no genuine dispute as to any material fact" and the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Here, Zandvakili "need only produce enough evidence to support a prima facie case and to rebut, but not disprove, [the University's] proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012). This can be accomplished by showing that the University's explanations are not credible. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997).

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

## III. ANALYSIS

Title VII prohibits discrimination in employment based on an employee's "national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer from "discriminating against" an employee because the employee "has opposed" unlawful employment practices. 42 U.S.C. § 2000e-3(a). Zandvakili argues that he established a genuine factual dispute that the University discriminated and retaliated against him when it (1) did not promote him to the position of Associate Dean, (2) denied his 2018 Article 15 raise request, and (3) gave him a nominal pay raise in response to his 2019 Article 15 raise request.

Title VII discrimination and retaliation claims based upon circumstantial evidence, as in this case where there is no direct evidence of national-origin discrimination, are considered using the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of setting forth a prima facie case of discrimination or retaliation. *Burdine*, 450 U.S. at 252–53. If the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant can articulate a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered are a pretext for discrimination or retaliation. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. The plaintiff does this by demonstrating that the employer's reason had no basis in fact, did not actually motivate the employer's action, or was an insufficient motivation. *O'Donnell v. City of Cleveland*, 838 F.3d 718, 728–29 (6th Cir.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

2016). The "ultimate inquiry" is whether the employer's stated reason is the true reason. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

## A.      Discrimination

A plaintiff makes out a prima facie case of discrimination when he shows that he: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was treated differently than a similarly situated, non-protected person. *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

### 1.      Associate Dean Promotion

To establish a prima facie case for a failure-to-promote claim, the plaintiff must show that "other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If the employer provides a legitimate, non-discriminatory reason for the different hire, the plaintiff can demonstrate pretext by showing that the plaintiff was clearly the superior candidate, such that no reasonable decisionmaker would opt for any other applicant, or that the plaintiff was at least as qualified as the successful candidate combined with other probative evidence of discrimination. *LeVine v. DeJoy*, 64 F.4th 789, 798–99 (6th Cir. 2023); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 816 (6th Cir. 2011); *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 625–28 (6th Cir. 2006). The pretext burden is not heavy. *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020).

The district court assumed that Zandvakili made a prima face case of national-origin discrimination but held that Zandvakili failed to rebut the University's proffered reasons for choosing Sox over Zandvakili, i.e., the belief that he was better suited for the position of Associate Dean of I&P. The district court considered the testimony of several hiring committee members.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Elaine Hollensbe, Department Head for the Department of Management within the Lindner College of Business, testified that the committee was "impressed with [Sox's] qualifications," including his "senior leadership experience," and the fact that "he had run a department." Craig Froehle, the Department Head of OBAIS, and Sox's supervisor, knew that Sox was "a very competent person . . . [who] held department head and leadership roles at his previous institution." Froehle stated that he did not focus on Sox's research record but more on his "leadership responsibilities and general demeanor and approach he took to developing his classes, teaching his classes, working with graduate students, [and] working with post docs[.]"

Lewis testified that everybody "individually and then collectively" agreed that Sox "was more experienced and better positioned for the key phases of the impact and partnership role, which was to build a platform to support our centers and institutes, connect them more visibly within the college, link them to what was going on in our community and on the campus." Lewis stated that, at his interview, Sox "shared" the work he had done at his former school, leading an "institute" "that ended up being quite significant in its work, both with the community as well as on campus, not just within the department." And he had become "very well connected" at the University. Thus, according to Lewis, it was Sox's "experience and sharing the process through which he developed an infrastructure, built the relationships, and started raising the impact and visibility of the work that he had done before UC and at UC," that "encouraged [the Committee] to say he would be the right person [] to get it moving and start building the infrastructure we needed."

Because Zandvakili is not claiming that he was clearly superior to Sox such that no reasonable decision maker would have chosen Sox instead of him, he must offer other probative evidence of discrimination in addition to proving he was as qualified. *Provenzano*, 663 F.3d at

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

815; *see also Bartlett v. Gates*, 421 F. App'x 485, 490–92 (6th Cir. 2010).[3]  The other evidence he offers is the alleged "inconsistencies and credibility issues regarding why Sox was selected."[4]

Zandvakili argues that the University's reasons for choosing Sox "diverge" from the criteria listed in the job posting, specifically in the criteria of leadership and community relations. As to leadership, Zandvakili points out that Sox's CV does not mention leading any "institute," and that neither Froehle nor Hollensbe mentioned "institute experience" during their deposition testimony.  But Zandvakili's hyperfocus on the term "institute" does not create an inference of pretext.  It is irrelevant that Sox's CV does not use the word "institute."  The testimony clearly referenced *some entity* Sox ran at the University of Alabama.  Sox's CV "state[d] that Sox led a 'Statistics Research and Consulting Lab,'" with three staff and an $800,000 budget, that was listed under his experience as Department Chair of the "Information Systems, Statistics, and Management Science (ISM) at the University of Alabama," from 2011 through 2016.  And Sox had the leadership experience desired by the hiring committee.  Sox was Department Chair of ISM from 2011–2016.  He showed academic leadership directing graduate students, and he directed a research and consulting lab.  Zandvakili can match Sox in leadership, but that is not the question. Zandvakili does not show Sox did not have the requisite experience.

---

[3] The University claims that we need not reach the question of pretext because the "honest belief rule" defeats his pretext argument.  If Lewis, the ultimate decisionmaker, "honestly believed" that Sox was the most qualified candidate, then it doesn't matter for discrimination purposes if she was wrong in her belief. *See Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001).  Although limited testimony in the record arguably supports that conclusion, (R. 15, PID 275), we opt to resolve this issue on pretext grounds.

[4] On summary judgment, the University argued that "Plaintiff cannot establish that his own qualifications were substantially similar or better than those of Sox, particularly when his own activity and productivity had been fairly low for nearly ten years."  Zandvakili says that this argument, which was made for the first time before the district court, is evidence of a shifting rationale, creating an inference of discrimination.  He notes that neither Froehle, Hollensbe, nor Lewis mentioned research when asked why they preferred Sox and it's not listed on the feedback form. But Zandvakili reads too much into the University's argument.  The University did not argue that the lack of research was relevant to the hiring committee's decision.  Rather, the University argued that because Zandvakili's productivity had been low for approximately ten years he was not comparable to Sox for purposes of a prima facie case.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Zandvakili's argument also fails on the community-relations front. Zandvakili focuses on external relations with the greater Cincinnati business community, but the hiring committee was not so limited. The hiring committee was equally concerned with internal college relations and community. Lewis testified that one of the purposes of the new position was "to build a platform to support our centers and institutes, connect them more visibly *within the college*, link them to what was going on in our community and *on the campus*." (Emphasis added). Zandvakili's CV does attest to his extensive Cincinnati community relationships, and the hiring committee noted that as one of his strengths. Sox did lack those Cincinnati relationships, but that evidence does not contradict the University's reasons for its hiring decision because the University wasn't exclusively focused on external relationships. Lewis noted that Sox "had become very well connected *on the [Cincinnati] campus*." (Emphasis added).

Regardless, after interviewing both Sox and Zandvakili, the University concluded that Sox gave a better interview. He convinced the committee that he was the best candidate for the Associate Dean position when he "shared" his work at the University of Alabama in developing an infrastructure, building relationships, and raising visibility. He also convinced the committee that he was "well connected" at the University. The Search Committee's feedback form supports the University's rationale for its decision. The committee gave Sox higher marks than Zandvakili in leadership, communication, interpersonal skills, and management skills. The "Group Consensus" was that Sox was a good fit and that Zandvakili was—"not fit for current needs." This "collective" consciousness weakens Zandvakili's attempts to create an inference of discriminatory intent. *See Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 806 n.2 (5th Cir. 2007).

The evidence points to the conclusion that the committee decided Sox was the better fit because of what he told them during his interview—conveying how his prior professional

-12-

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

experience involved "building infrastructure." "[E]mployers are generally free to choose among qualified candidates," *Levine,* 64 F. 4th at 798 (cleaned up), and Zandvakili has not provided other evidence from which illegal motive can be inferred. The University's preference for Sox is therefore entitled to deference. *Id.* Zandvakili has not met his burden on rebuttal.

### 2. 2018 Article 15 Raise

The district court did not assume a prima facie case for Zandvakili's 2018 Article 15 request discrimination claim. Instead, the district court held that Zandvaikili could not identify a comparator because Williams, the decisionmaker, did not grant *any* Article 15 requests during his time as Interim Dean. Zandvakili contends that the "same-supervisor rule" should not be applied and that he should be compared to Brasington, who received a $34,000 raise from Szymanski, the previous Dean.

To satisfy the similarly situated requirement, the plaintiff and comparator: (1) must share the same supervisor; (2) be subject to the same standards; and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The circumstances of the two employees need not be identical, but they must be similar in "all of the *relevant* aspects." *Id.* This is not an "inflexible" rule, however—we have repeatedly held that "[w]hether the 'same supervisor' criterion 'is relevant depends upon the facts and circumstances of each individual case.'" *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 n.3 (6th Cir. 2023) (quoting *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (same). "[R]equiring comparators to have the 'same supervisor' may be better understood as requiring

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

comparators to have 'dealt with the same ultimate decision-maker.'" *Goldblum*, 62 F.4th at 255 n.3 (quoting *McMillan*, 405 F.3d at 414).

If Williams is the ultimate decision maker, Zandvakili has no comparator and therefore no prima facie case. Zandvakili contends that the provost is the ultimate decisionmaker, citing testimony to that effect by Szymanksi. And both Williams and Lewis made "recommendations" to the provost when approving a salary adjustment. However, the record reflects that, in practice, the buck stops with the dean because the dean has discretion to grant or deny an Article 15 request and, if he or she denies it, the provost never considers it. Lewis testified that the decision to grant or deny an Article 15 request was solely hers. Lewis even developed her own process to review such requests.

Therefore, contrary to Zandvakili's argument, adhering to the "same-supervisor rule" makes more sense in this context. Thus, Zandvakili fails at the fourth prong of his prima facie case because he cannot point to a "same supervisor."

### 3.    2019 Article 15 Raise

The district court held that Zandvakili did not make a prima facie case of discrimination on his 2019 Article 15 request because he received a $6,000 raise, and he did not identify a comparator. Zandvakili correctly points out that a nominal raise *can* be an adverse action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402–03 (6th Cir. 2008) (lower salary increase than deserved); *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 802 (6th Cir. 2004); *Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 693–94 (6th Cir. 2012) (disparate pay increase). Regardless, Zandvakili's 2019 Article 15 discrimination claim still fails. He did not identify a similarly situated person whom Lewis treated more favorably.

-14-

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Lewis testified that she had four Article 15 requests when she started, two from the OBAIS Department, one from Pal, and Zandvakili's. She "made adjustments"[5] to the two individuals in OBAIS, gave Zandvakili a $6,000 raise, and awarded Pal nothing. Zandvkali's closest comparator would have been Pal, but Lewis denied Pal's request in toto because in her view "he was within median range for all three of those things: His field, his rank, his performance." Despite Zandvakili's insistence to the contrary, Brasington was not a comparator because his raise was granted by a different decision-maker. Thus, we agree with the district court's conclusion that Zandvakili fails at the fourth prong of his prima facie case.

The University also presented a legitimate, nondiscriminatory reason for reducing Zandvakili's 2019 request—he wasn't actively publishing in any leading academic journals. Lewis recognized that Zandvakili had a "solid teaching record," that "[h]e cares about his students," and that "he is a solid departmental contributor, but not necessarily a college or university contributor." This made him "solid" but not "excellent," which is why she didn't give him the requested $50,000. Lewis emphasized that "in the case of tenure-track faculty, overwhelmingly, . . . the deciding factor for salary is research." Its merits may be debated, but the aphorism is apt: "publish or perish."

Zandvakili argues that Lewis ignored one of her own standards and attacks her process in excluding Brasington's salary from the "internal market," which he states caused her to artificially deflate the average income for [tenured] professors in the Department. He also argues that she ignored the external-market data of comparable [tenured] professors and "[t]hese inconsistencies and subjective metrics smack of pretext."

---

[5] It is not clear what the adjustments were.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Zandvakili is not right. Brasington was excluded from the internal market because his salary was an outlier. Lewis testified that excluding a salary from the internal benchmark range was "a consistent approach we use across departments, if there is a very high external outlier." There is no evidence that Lewis did not consistently exclude such outliers in her other recommendations. Moreover, Lewis did not compare Zandvakili to Brasington because Brasington was actively publishing. Though Zandvakili argues that Lewis's reliance on publishing activity is misplaced because it is meant to determine class load and not salary, her classification is not irrational. Moreover, there is no evidence that Lewis inconsistently applied the classifications of SA or PA to professors she evaluated. And there is no evidence that discrimination motivated Lewis's use of the PA/SA classifications.

Lewis also did not subjectively ignore her own process. As she explained to Zandvakili in a March 24, 2020, email, she "developed [the] benchmark sample (AASCB Public Peer) with [Department Head] input into the schools." According to Lewis, data for PAs was insufficient, so she relied on "[t]he SA Public Peer Median salary for SA Associate Professors [which was] $130,800 (and for SA Full Professors [which was] $159,100)." If anything, Lewis ignored her process by granting Zandvakili a raise instead of denying it altogether. According to her process, his pay of just over $139,000 was appropriate for a PA [Tenured] Professor. "But [she] very much wanted to find a way to find some support for [Zandvakili]. So . . . [she] looked for a structural adjustment, which was not necessary but [she] felt appropriate, given [her] respect for [him] and [her] hope that he would further engage."

In the end, the record fails to show that Zandvakili's national origin had any effect on his career. Rather, if anything, Zandvakili was impacted by "salary inversion," whereby, due to inflationary pressure, new associate professors are hired at a higher salary than tenured professors

-16-

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

can reach through incremental raises within the institution. Lewis observed that the phenomenon is "pervasive" "among tenure track senior faculty . . . across business schools globally." Title VII is not the proper forum to address this known phenomenon.

## B.     Retaliation

Although the *McDonnell Douglas* framework applies to retaliation claims, the elements of a prima facie case are different. A plaintiff must show that: (1) he engaged in protected activity; (2) the defendants knew it; (3) he suffered an adverse action; and (4) the protected activity was the "but for" cause of that action. *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022). Establishing an adverse employment action is "less onerous" than in a discrimination action, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007), but proving causation is harder because retaliation must be the but-for cause of the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Temporal proximity on its own is usually not sufficient to establish causation, *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020), but can be if the adverse action was "taken just days or weeks from when the employer learns of the employee's protected activity." *George*, 966 F.3d at 460.

### 1.     Associate Dean Promotion and 2019 Article 15 Pay Raise

Zandvakili contends that Lewis rejected him for the promotion to Associate Dean of I&P "in the midst of his on-going complaints" of discrimination and retaliation. He asserts that his rejection for the Associate Dean position was in close temporal proximity to the complaints he made to and about Lewis. He had been complaining to Lewis since July 26, 2019, about the University's discrimination against himself and others, including her long delay in deciding on his 2019 equity request.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Zandvakili doesn't show temporal proximity. He first complained to Lewis in July 2019 and does not articulate any complaint that he made to her closer in time to her rejection. He must provide other evidence, but he hasn't. *See Nguyen*, 229 F.3d at 566–67 (stating that temporal proximity must usually be combined with "other compelling evidence" of retaliation). A major issue in establishing a prima facie case here is that the entire hiring committee preferred Sox. As the Fifth Circuit has stated, "collective decision-making is less susceptible to influence by an individual with a retaliatory motive." *Strong*, 482 F.3d at 806 n.2. Moreover, there is no evidence that other members of the hiring committee were aware of Zandvakili's complaints. And there is no evidence, compelling or otherwise, that Lewis was retaliating against Zandvakili.

Zandvakili also argues that Lewis's grant of only a minimal raise was retaliatory and points to alleged inconsistencies in Lewis's statements about when she would process his request and how she made her decision. But Lewis's explanations about how and why she processed the Article 15 requests are consistent. She consistently stated that she would not be making any Article 15 decisions before late fall of 2019, and she did not do so. And Lewis's statement that the Provost's Office told her not to process the Article 15 request while the EEOC charge was pending does not "smack[] loudly of retaliatory intent" because, as her email correspondence with Zandvakili demonstrates, she *misunderstood* what the Provost's Office said and corrected the problem promptly. Lewis "confirm[ed] Zandvakili's "understanding" that "the EEOC Complaint and Article 15 Review are separate and distinct," and she explained in her deposition testimony that the "confusion" was hers. Furthermore, Lewis testified that she thought that the EEOC complaint could help Zandvakili's cause, not hinder it. In any event, the statement does not support an inference of retaliation on Lewis's part because the statement allegedly came from the Provost's Office and did not reflect Lewis's viewpoint.

-18-

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

Thus, we cannot infer discrimination when: (1) at least three months elapsed between the protected activity and the alleged adverse action; (2) Lewis gave him a raise based on an objective methodology that she consistently applied; and (3) she asked for the raise to be backdated nine months.

### 2. 2018 Article 15 Raise

The district court held that Zandvakili failed to rebut the University's explanation that it denied his 2018 Article 15 request due to a budget crisis. Zandvakili faults the district court for failing to consider temporal proximity and Williams's shifting reasons for his decision. For his retaliation claim to survive, Zandvakili must show: (1) temporal proximity between his protected activity and the denial of his Article 15 request; (2) that Williams knew of his protected activity; and (3) some evidence that the University's rationale was pretextual.

Zandvakili claims that Williams's October 11, 2018, denial of his Article 15 request was in retaliation for (1) his July 20, 2018, complaints to Williams and his formal complaint with OEOA about his inability to apply for the MA-HR directorship; and (2) his October 9, 2018, complaint to Matthew Olovson, Executive Director of OEOA, about Williams's inaction on his 2018 Article 15 request.

The July 20 complaints to Williams and OEOA are proximate to Williams's denial of Zandvakili's Article 15 request (less than three months), and Williams obviously was aware of them. Williams's denial is significantly more proximate to Zandvakili's October 9 complaint to OEOA (two days). Two days is close enough to infer pretext based on the timing alone. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (several days between protected activity and adverse action sufficient); *Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 473 (6th Cir. 2002) (recognizing that retaliation within a few days can show pretext because

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

"in such a short period of time little other than the protected activity could motivate the retaliation"); *Howington v. Quality Restaurant Concepts, LLC*, 298 F. App'x 436, 447 (6th Cir. 2008) (two days between protected activity and retaliation created an inference of causation without additional evidence). But there is no evidence that Williams knew about the October 9 complaint.

This means that Zandvakili must provide other evidence. Shifting rationales "can be evidence of pretext." *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). Williams testified that he denied Zandvakili's request because of a severe budget shortfall.[6] Zandvakili says that this explanation is inconsistent with Williams's October 11 letter stating that Zandvakili didn't qualify for a raise under Article 15 and that the October 11 letter is inconsistent with Williams's September 6 draft letter stating that he supported a pay raise for Zandvakili to ensure that the University's tenured professors earned more than the associate professors. In addition, Williams admitted that Article 15 permits raises based on equity and that Zandvakili's salary was lower than the salary of one of the University's associate professors as well as the average salary of other economic departments with Ph.D. programs.

But context matters. Taken separately, Williams's actions do look suspicious. Seen as a whole, however, the alleged inconsistencies vanish. Williams testified that when he received Zandvakili's Article 15 request, he recognized that Zandvakili was earning less than associate professors and asked the Provost's Office how to handle the situation. Based on that advice, Williams decided to raise Zandvakili's salary above the highest-paid associate professor. This

---

[6] Zandvakili argues that the budget crisis did not prevent Szymanski or Lewis from granting Article 15 raises, but there are two problems with this argument. First, Williams was the decision-maker in 2018, so it is his perception of what the budget allowed that controls and not Szymanski's or Lewis's. Second, the evidence showed that the Article 15 raise granted by Szymanski was financially neutral for the University because of offsetting savings and that the financial crisis had greatly improved by the time Lewis became Dean.

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

explains the September 6 draft letter. But based on his experience, Williams knew he needed to consult the business officer before making a final decision, and so he did. She informed him that the University was in a "budgetary crisis" and if the University had to equitize the salaries of every full professor paid less than associate professors, it would cost "hundreds of thousands of dollars." As the raise could not be granted based on equity, Williams then considered Zandvakili's performance and concluded that it was not "exceptional" because he hadn't published since 2012. Because he could not grant the raise based on equity and did not believe that a merit raise was warranted, Williams issued his October 11 denial letter. The testimony is not inconsistent with either the budget crisis, the existence of which was uniformly confirmed by numerous individuals, or with the lack-of-merit rationale.

It is undisputed that Zandvakili has an impressive record. But rather than supporting his merit argument, the record supports the University's consistent statements that Zandvakili did not merit a raise because he was not actively publishing. Certainly, reasonable minds could dispute whether Zandvakili deserved to receive a raise based on lifetime achievement, but Title VII does not require the University to grant that type of raise, and there is no reason to believe that the University's consistent explanation regarding active publication as the basis for its merit evaluation was retaliatory. Thus, the facts in full belie Zandvakili's argument about shifting rationales and instead confirm that Williams's decision to deny the Article 15 request was motivated by the business school's financial crisis as well as his evaluation of Zandvakili's performance. Additional, nondiscriminatory reasons that are not in conflict do not show shifting justifications. *See Miles*, 946 F.3d at 891; *Ames v. Dep't of Youth Servs.*, 87 F.4th 822, 826 (6th Cir. 2023) (per curiam) (same). Zandvakili has not shown any inconsistencies in the University's

-21-

No. 23-3396, *Zandvakili v. Univ. of Cincinnati, et al.*

reasoning and therefore has not met his burden to show pretext at the third stage of the *McDonnell Douglas* test.

## IV.  CONCLUSION

AFFIRMED.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-3396

SOURUSHE ZANDVAKILI,

     Plaintiff - Appellant,

v.

UNIVERSITY OF CINCINNATI; DAVID SZYMANSKI,
NICOLAS WILLIAMS, and MARIANNE LEWIS, in their
official and individual capacities,

     Defendants - Appellees.

> **FILED**
> Jan 25, 2024
> KELLY L. STEPHENS, Clerk

Before:  BOGGS, SUHRHEINRICH, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is
AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Kelly L. Stephens, Clerk